1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JANAN VARGHESE JACOB, et al.,

Plaintiffs,

v.

JOSEPH R. BIDEN, JR. et al.,

Defendants.

Case No. 21-cv-00261-EMC

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS**

Docket No. 60

Plaintiffs are 2,196 immigrant visa applicants or their United States citizen and legal permanent resident family members who bring suit on behalf of a putative class of more than 450,000 applicants in the immediate relative and family preference categories, along with a limited number of selectees from the Diversity Visa 2021 lottery program. This suit challenges (1) the legality of Presidential Proclamation 10014 ("P.P. 10014") and its extensions, which suspended the entry into the United States of most aliens as immigrants subject to certain limited exceptions, and (2) the implementation of P.P. 10014 by the Department of State ("DOS"), which suspended the processing and adjudication of applications from immigrants who were subject to the entry ban. The Biden Administration has rescinded P.P. 10014 with Presidential Proclamation 10149 ("P.P. 10149"), and the Government moves to dismiss this case as moot under Federal Rule of Civil Procedure 12(b)(1). Docket No. 60.

## I.    **INTRODUCTION**

A.    Factual Background

On April 22, 2020, President Trump enacted P.P. 10014, titled *Suspension of Entry of Immigrants Who Present a Risk to the United States Labor Market During the Economic Recovery*

*Following the 2019 Novel Coronavirus Outbreak*, pursuant to his authority under § 1182(f) of the Immigration and Nationality Act ("INA"). 85 Fed. Reg. 23441 (Apr. 27, 2020). P.P. 10014 suspended the entry of certain aliens as immigrants into the United States for 60 days, with limited exceptions, under the stated rationale of protecting the U.S. economy from excess labor supply during the COVID-19 pandemic. *Id.* The entry restriction did not apply to, *inter alia*, spouses of U.S. citizens (IR-1 visa applicants) and minor children of U.S. citizens (IR-2 visa applicants). *See* Proc. 10014 §§ 2(b)(iv), 2(b)(v). President Trump subsequently issued a renewing Proclamation which extended the entry ban to December 31, 2020. 85 Fed. Reg. 38263 (June 22, 2020). On December 31, 2020, the ban was further extended by Proclamation to March 31, 2021. 86 Fed. Reg. 417 (Dec. 31, 2020). Plaintiffs filed suit on January 11, 2021 challenging the lawfulness of the Proclamation and its extensions as unconstitutional and violative of the Administrative Procedure Act ("APA"). They also alleged that, in implementing the Proclamations, DOS unlawfully suspended the *processing and issuance* of visas to aliens who were covered by the *entry* ban, and who were otherwise documentarily qualified and eligible to receive a visa (the "No-Visa Policy").

On February 24, 2021, President Biden issued P.P. 10149, which rescinded P.P. 10014 and its extensions. 86 Fed. Reg. 11847 (Feb. 24, 2021). It provides that the entry ban "harms the United States, including by preventing certain family members of United States citizens and lawful permanent residents from joining their families here." *See id.* It further directs "[t]he Secretary of State, the Secretary of Labor, and the Secretary of Homeland Security [to] review any regulations, orders, guidance documents, policies, and any other similar agency actions developed pursuant to Proclamation 10014 and, as appropriate, issue revised guidance consistent with the policy set forth in this proclamation." *Id.* In response to P.P. 10149, DOS sent out a cable directing consular posts to process applications without regard for P.P. 10014, and to prioritize the processing of immigrant visa applications that were previously interviewed and refused solely because of the Proclamation. Docket No. 59-5.

B.  <u>Procedural Background</u>

The complaint names 2,438 individual Plaintiffs in 81 countries and is brought as a class

action. Plaintiffs moved for an emergency motion for a temporary restraining order ("TRO") and to certify the class. Docket Nos. 1, 4. The case was initially assigned to Judge Donato, who dismissed the complaint *sua sponte* because its massive length did not adequately apprise the Government of the claims to be answered under Rule 8's pleading standards. Docket No. 13. Plaintiffs then filed an amended complaint, a renewed motion to certify the class, and a motion for a TRO. Docket Nos. 14, 16, 17. While these motions were pending, this Court found that the instant case was related to *Young*. In *Young v. Trump*, No. 20-cv-07183-EMC, 2020 U.S. Dist. LEXIS 233614 (N.D. Cal. Dec. 11, 2020), the Court granted preliminary injunctive relief for 181 Plaintiffs who had immediate family members with approved immigrant visa petitions subject to the No-Visa Policy, finding that Plaintiffs had raised serious questions going to the merits on their APA and Constitutional claims. *Id.* at *51-57. The Court enjoined DOS from carrying out Section 1 of P.P. 10014 and the No-Visa Policy with respect to the named Plaintiffs, and it ordered DOS to undertake good-faith efforts to process Plaintiffs' applications. *Id.* at *57-58. However, the order clarified that DOS could still prioritize the processing, adjudication, and issuance of visas based on resource constraints and limitations due to the COVID-19 pandemic, so long as such decisions were not informed or affected by P.P. 10014 or the No-Visa Policy. *Id.* at *58-59.

The Court denied the TRO in the instant case, refusing to grant classwide relief absent class certification. Docket No. 32. However, the Court converted Plaintiffs' motion for a TRO into a motion for a Preliminary Injunction. *Id.* Plaintiffs moved to expedite the hearing schedule on the pending motions for class certification and preliminary injunctive relief (Docket No. 35), which the Court granted (Docket No. 39).

On February 18, 2021, the Court heard argument on Plaintiffs' Motion for Class Certification (Docket No. 16) and Motion for Preliminary Injunctive Relief (Docket No. 31). At the hearing, the Government informed the Court that Executive action was imminent with respect to P.P. 10014. On February 24, 2021, the Government notified the Court of President Biden's rescission of P.P. 10014. Docket No. 53.

The parties subsequently submitted a status report in which they disputed whether the rescission of P.P. 10014 rendered the case moot. Docket No. 55. The parties made their mootness

1    arguments at a status conference held on March 4, 2021.  At the status conference, the Court

2    ordered the Government to submit a report detailing:

> "(1) specific data and statistics on the size of the current immigrant
> visa backlog, setting forth the numbers for family-based and DV
> visas in particular; (2) a description of the specific types of visas
> that were affected by PP 10014 and those that were not affected,
> and data on the number of pending visas in each of those
> categories; (3) the pace at which family-based and DV visas are
> now being processed and issued since the rescission of the
> Proclamation, and (4) the guidance which DOS has sent (or which
> it plans to send) to consular posts for processing visas without
> consideration of PP 10014 and the timeline expected for issuance
> of future guidance."

9    *See* Minute Order (Docket No. 56).  The Government submitted its Data Report on March 11,

10   2021.  Docket No. 59.  It moved to dismiss the case as moot, for lack of subject matter jurisdiction

11   under Rule 12(b)(1), on March 15, 2021.  Docket No. 60.

## II.    DISCUSSION

13        Standing is an "irreducible constitutional minimum" which contains three distinct

14   elements.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  First, the Plaintiff must have

15   suffered an injury-in-fact, the invasion of a legally protected interest which is "(a) concrete and

16   particularized" and "(b) actual or imminent, not conjectural or hypothetical."  *Id.* (internal

17   quotations omitted).  Second, there must be a "causal connection between the injury and the

18   conduct complained of," which means that the injury must be fairly traceable to the challenged

19   action of the Defendant and must not be the result of an independent third-party action that is not

20   before the Court.  *Id.* at 560-61.  Third, it must be likely (as opposed to merely speculative) that

21   the injury will be redressed by a favorable court decision.  *Id.* at 561.

22        Article III's case or controversy requirement "subsists through all stages of federal judicial

23   proceedings."  *Spencer v. Kemna*, 523 U.S. 1, 7, 118 S. Ct. 978, 983 (1998).  *See also FEC v. Wis.

24   Right to Life, Inc.*, 551 U.S. 449, 461, 127 S. Ct. 2652, 2662 (2007) ("Article III's 'case-or-

25   controversy requirement subsists through all stages of federal judicial proceedings . . . . [I]t is not

26   enough that a dispute was very much alive when suit was filed'") (citing *Lewis v. Continental

27   Bank Corp.*, 494 U.S. 472, 477, 110 S. Ct. 1249, 108 L. Ed. 2d 400 (1990)).  A case becomes

28   moot "'when the issues presented are no longer 'live' or the parties lack a legally cognizable

interest in the outcome.'" *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91, 133 S. Ct. 721, 726 (2013) (quoting *Murphy v. Hunt*, 455 U. S. 478, 481, 102 S. Ct. 1181, 71 L. Ed. 2d 353 (1982) (*per curiam*)). Further, "when it is impossible for a court to grant *any* effectual relief whatever to the prevailing party," the case is moot. *Decker v. Nw. Envtl. Def. Ctr.*, 568 U.S. 597, 609, 133 S. Ct. 1326, 1335 (2013) (emphasis added). In many ways, standing and mootness inquiries overlap.

A.      Injury

Plaintiffs allege that they continue to suffer three different kinds of harm.

1.      Ongoing Harm from Diplomacy Strong

First, Plaintiffs allege that they suffer ongoing injury from the policies, procedures, and practices associated with P.P. 10014. Opp. at 8. These policies include DOS's Diplomacy Strong framework and the "Mission Critical/Emergency Designation" requirements, through which DOS allegedly continues to place a moratorium on visa processing in the immigrant visa categories previously subject to P.P. 10014's entry ban. *Id.* Even when a consular post has no immigrant visa backlog, Plaintiffs contend that the mission critical and emergency designation requirements prevent consular officers from scheduling or adjudicating an immigrant visa application from an applicant in a family preference or diversity visa category. *Id.* at 8-9. Thus, consular officers can still be prohibited from adjudicating family preference visa categories under the No-Visa Policy created by Diplomacy Strong. *Id.* at 9.

These arguments are unpersuasive. Pursuant to President Biden's directive, DOS has ordered that consular posts are to process applications without regard for P.P. 10014. The Government maintains herein that it is processing all family-based, employment, and diversity visas without regard for P.P. 10014. Mot. at 11; Reply at 9. The Court presumes that the Government acts in good faith when it voluntarily changes its policies. *Am. Cargo Transp., Inc. v. United States*, 625 F.3d 1176, 1180 (9th Cir. 2010). There is no evidence that DOS is failing to implement the rescission of P.P. 10014 per President Biden's directive in P.P. 10149. Now that P.P. 10014 and the No-Visa Policy have been rescinded, the personnel and resource decisions taken pursuant to the rescission are within the Secretary's authority under §2651a (a)(3)(A), so long as such decisions are not *ultra vires* as in *Young*. *See Young*, 2020 U.S. Dist. LEXIS 233614

at *56-57 ("[t]he Court does not dispute the Secretary's authority to direct DOS personnel and the U.S. Foreign Service in the midst of a global pandemic, pursuant to his statutory authority under § 2651a (a)(3)(A) … [though such authority] does not permit the Secretary to enact a complete and categorical suspension of the processing of eligible visa applications, irrespective of pandemic conditions").

Instead, the current restrictions on visa processing are based on a conditions-based approach to the phased reopening of in-person operations and inter-agency decisions driven by resource limitations and the health and safety of agency employees, not P.P. 10014. Plaintiffs suffer no direct and personalized injury from Diplomacy Strong.

2.    Ongoing Harm from DOS's "Tiered" Approach to Visa Adjudication

Instead, the question is whether there is a residual effect from the freezing of the processing of affected visa applications, which now number in the hundreds of thousands. In a Joint Status Report submitted on May 18, 2021, Plaintiffs introduced a revised theory of harm directed at the residual effect in this new reality. Plaintiffs provided data showing a disparity, since the rescission of P.P. 10014, in the speed by which family preference visas are being issued compared to those visa categories which were excepted from the Proclamation (*i.e.*, IR-1 and IR-2 visas for spouses and minor children of U.S. citizens). Joint Status Report at 1-5 (Docket No. 80).

Plaintiffs report that, during a four-week period from April 9, 2021, to May 6, 2021, the average number of visas issued per week for IR-1 and IR-2 applicants was 1,875.5 visas. *Id.* at 2. The average number of visas issued per week for IR-1 and IR-2 applicants in 2019 was 1,755 visas. *Id.* This represents a **7% increase** in the pace of adjudication for IR-1 and IR-2 visas, which were not subject to P.P. 10014. *Id.* On the other hand, for family preference visas, which were subject to P.P. 10014, DOS averaged 1,767 visas issued per week during that same four-week period from April 9, 2021, to May 6, 2021. *Id.* at 3. The weekly average for family preference applicants in 2019 was 3,662 visas. *Id.* This represents a **51% decrease** in the pace of adjudication for family preference visas compared to the past. *Id.* Additionally, for diversity visas, the weekly average from April 9, 2021, to May 6, 2021, was 131 visas, and the weekly average of DV issuances between 1998 and 2016 was 976 visas, which represents an **86%**

**decrease** compared to the past.  *Id.* at 5.

The disparity is even starker at the U.S. embassies in Manila and Mumbai, the two embassies which Plaintiffs contend are currently processing the greatest number of family preference applicants.  In March 2021, the U.S. Embassy in Manila issued 1,106 visas to IR-1 and IR-2 applicants, and when compared to the 396 IR-1 and IR-2 visas issued in March 2019, this represents a **174% increase**.  *Id.* at 3.  In contrast, the U.S. Embassy in Manila issued 33 visas to family preference applicants in March 2021, and when compared to the 1,118 family preference visas issued in March 2019, this represents a **97% decrease**.  *Id.*  In March 2021, the U.S. Embassy in Mumbai issued 990 visas to IR-1 and IR-2 applicants, and when compared to the 297 IR-1 and IR-2 visas issued in March 2019, this represents a **233% increase** in the pace of adjudications.  *Id.* at 4.  In contrast, the U.S. Embassy in Mumbai issued 4 visas to family preference applicants in March 2021, and when compared to the 937 family preference visas issued in March 2019, this represents a **99.5% decrease**.  *Id.*  Thus, Plaintiffs note that DOS has *increased* its capacity to adjudicate visas for spouses and children of U.S. citizens at these posts when compared to pre-COVID-19 levels, while it has significantly decreased its capacity to adjudicate visas for family preference and DV-2021 applicants.  Plaintiffs contend that this disparity is an ongoing harm which is directly attributable to the No-Visa policy and P.P. 10014.  *Id.*

The Government counters that 2019 is not a proper benchmark for the appropriate pace of visa adjudications, and that these statistics ignore the toll which the pandemic has taken on consular operations worldwide.  *Id.* at 9-10.  Additionally, the Government has submitted supplemental briefing explaining the origins of a tiered visa prioritization scheme, and the timing of its initiation vis-à-vis P.P. 10014.  Defendants' Supplemental Briefing in Support of their Motion to Dismiss (Docket No. 88).  Prior to the implementation of the current tiered approach, consular visa operations were guided by Diplomacy Strong, which was a conditions-based approach to the phased resumption of services based primarily on medical and health conditions at each individual post.  *Id.* at 3.  In November 2020, DOS issued new guidance which explicitly severed the link between a particular Diplomacy Strong phase and the visa services provided by

that post.  *Id.*  This guidance constitutes the tiered approach which Plaintiffs now challenge.  The tiered approach prioritizes immigrant visa categories as follows:

> "•**Tier One**: Immediate relative intercountry adoption visas, age-out cases (cases where the applicant will soon no longer qualify due to their age), and certain Special Immigrant Visas (SQ and SI for Afghan and Iraqi nationals working with the U.S. government);
>
> •**Tier Two**: *Immediate relative visas (for spouses, children, and parents of American citizens)*; fiancé(e) visas; and returning resident visas (for individuals who already have lawful permanent resident status but need a visa to return to the United States);
>
> •**Tier Three**: *Family preference immigrant visas* and SE Special Immigrant Visas for certain employees of the U.S. government abroad; and
>
> •**Tier Four**: All other immigrant visas, including employment preference and *diversity visas.*

*Id.* at 4-5.  DOS's rationale for the tiered prioritization scheme was that Congress, in a public law, has required DOS to adopt a policy of processing immediate relative visa applications within 30 days.  *Id.* at 5 (citing Foreign Relations Authorization Act, Fiscal Year 2003, 107 P.L. 228, 116 Stat. 1350, 1373, § 233(a) ("[i]t shall be the policy of the Department to process each visa application from an alien classified as an immediate relative or as a K-1 nonimmigrant within 30 days of the receipt of all necessary documents from the applicant and the Immigration and Naturalization Service")).  Based on this Congressional instruction, and the INA's stated policy of family reunification, DOS determined that immediate relative visa categories should be prioritized over most other immigrant visa categories.  *Id.*  On February 19, 2021, DOS sent updated guidance, which instructed that "[p]osts with an IR backlog should still schedule some Family Preference (FP) cases, Employment Preference (EP), and Diversity Visa (DV) cases each month considering the backlog, if any, for each type of case, but allocate *at least 75 percent of each month's appointments to backlogged IRs*."  *Id.* at 6 (emphasis added).  The Government states that this guidance was not promulgated under P.P. 10014 and is therefore not covered by Plaintiffs' claims.  *Id.*  Additionally, the Government states that the November 2020 prioritization guidance did not presume P.P. 10014 and its progeny would remain in force and was not dependent on the existence or continuance of the Proclamation.  *Id.* at 2.  The tiered approach is thus not causally

linked to P.P. 10014 or the No-Visa Policy.

Although Plaintiffs challenged the lawfulness of the No-Visa Policy implemented to enforce P.P. 10014, *see* FAC § 7 ("Prayer for Relief"), the current tiered prioritization scheme is a different matter unconnected to P.P. 10014 and DOS's prior No-Visa Policy. The November 2020 guidance on the tiered prioritization scheme "replaced the phased resumption of services" prescribed by Diplomacy Strong, and this guidance was not dependent on the existence or continuance of any specific Proclamation. Defendants' Supplemental Briefing in Support of their Motion to Dismiss at 2-4 (Docket No. 88). The February 19, 2021 guidance, which directs consular posts to allocate at least 75 percent of each month's appointments to backlogged applicants in the immediate relative categories, was not promulgated under P.P. 10014.[1] *Id.* at 6.

Plaintiffs argue that this tiered prioritization scheme violates the INA by unlawfully prioritizing one visa category over another without any rational explanation. Plaintiffs' Response to Defendants' Explanation of the Department of State's Tiered Approach at 5-6 (Docket No. 90). But this constitutes an entirely new claim from that asserted herein.

Notably, the Government has submitted data showing that DOS is issuing visas to family preference and IR-5 applicants in numbers that approach the level of issuances for IR-1 and IR-2 applicants. During the six-day period from May 14, 2021, to May 20, 2021, DOS issued **3,530 visas** to applicants in categories previously subject to P.P. 10014 (*i.e.*, IR-5 and family preference applicants), and it issued **2,456 visas** to applicants in categories that were excepted from P.P.

---

[1] Additionally, the visa categories previously subject to P.P. 10014 and the No-Visa Policy are not coterminous with the tiers of DOS's visa prioritization scheme. Like the family preference visa categories, IR-5 applicants (parents of U.S. citizens) were subject to P.P. 10014. *See* Second Austin Decl. at 3-4 (Docket No. 59-2). However, IR-5 visas are placed in a higher tier than family preference applicants: IR-5 applicants are in Tier Two, while family preference applicants are in Tier Three. Defendants' Supplemental Briefing in Support of their Motion to Dismiss at 4-5. Further, IR-5 applicants are among those applicants that consular posts have been instructed to prioritize under the tiered prioritization scheme (posts must allocate at least 75% of each month's appointments to backlogged cases in the immediate relative categories, which includes IR-5 applicants). *Id.* at 6. Thus, IR-5 applicants experienced the same adverse effects as family preference applicants under the No-Visa Policy (a freeze in the processing and adjudication of their applications), but they are given a higher tier than family preference applicants under the tiered prioritization scheme. The difference in treatment of IR-5 applicants is further evidence that the prior No-Visa Policy and the current tiered prioritization scheme are distinct and separate. The complaint in the instant case challenges the implementation of P.P. 10014 via the No-Visa Policy, not the tiered prioritization scheme.

10014 (*i.e.*, IR-1 and IR-2 applicants). Defendants' Biweekly Status Report at 2-3 (Docket No. 87). During the six-day period from May 21, 2021, to May 27, 2021, DOS issued **3,682 visas** to applicants in categories previously subject to P.P. 10014 (*i.e.*, IR-5 and family preference applicants), and it issued **2,350 visas** to applicants in categories that had been excepted from P.P. 10014 (*i.e.*, IR-1 and IR-2 applicants). *Id.*

In sum, the Court holds that the alleged harm from the tiered prioritization scheme is not at issue in the instant case, because Plaintiffs did not allege such harm in the operative complaint. The theory of harm from the tiered prioritization scheme is the result of a different DOS policy which is not the subject of this suit.

### 3. Residual Harm from P.P. 10014 and DOS's Implementation

Finally, Plaintiffs have alleged a residual, lingering harm from the "compounding delays" in the adjudication of immigrant visas caused by P.P. 10014 and its implementation by DOS. Opp. at 4, 9. In effect, there are lingering delays suffered by visa applicants whose applications have been frozen for over a year by P.P. 10014 and the No-Visa Policy. Plaintiffs seek a form of restorative justice via an order mandating the expeditious adjudication of their backlogged applications. *See id.* at 12. Plaintiffs seek mandamus relief for agency action unreasonably delayed or unlawfully withheld under the APA, pursuant to 5 U.S.C. §§ 555(b) and 706(1). FAC ¶¶ 181-200.

The yearly data on visa adjudication suggests that some delays in visa processing are directly attributable to the massive scaling back of DOS operations in response to the COVID-19 pandemic, and not to P.P. 10014. The data shows that there would have been a worldwide decrease in visas issued at consular posts even if P.P. 10014 had never been enacted. For instance, in the immediate relative visa categories that were *excepted* from P.P. 10014 (*i.e.*, for all immediate relative visa applicants except for IR-5 applicants), there was an approximate **37% decrease** in total visas issued from fiscal year 2019 to fiscal year 2020: 123,142 visas issued in FY 2019 compared to 77,800 issued in FY 2020. *See* Table II, Classes of Immigrants Issued Visas at

Foreign Service Posts Fiscal Years 2016-2020.[2]  This 37% decrease shows that the pandemic had a significant effect on visa processing and issuance independently of P.P. 10014.  Even those visa categories not subject to the No-Visa Policy experienced a significant reduction in visas issued.

However, this data also provides important context for the decrease in the immigrant visa categories that *were* subject to the No-Visa Policy.  For the family-preference visa categories and IR-5 visa applicants, there was an approximate **53% decrease** in visas issued from fiscal year 2019 to fiscal year 2020: 254,380 visas issued in FY 2019 compared to 120,927 visas issued in FY 2020.  *See id.*  For Diversity Visa selectees, there was an approximate **59% decrease** in visas issued during that same period: 44,882 visas issued in FY 2019 compared to 18,288 visas issued in FY 2020.  *See* Table I, Immigrant and Nonimmigrant Visas Issued at Foreign Service Posts Fiscal Years 2016-2020.[3]  The decrease in visa issuance in the IR-5/family-preference and diversity visa categories (53% and 59%, respectively) is significantly greater than the decrease in the immediate relative visa categories (37%).  Applicants in the IR-5/family-preference categories experienced a decrease in visa issuance that was **16%** greater than the decrease in visa issuance for applicants in the immediate relative categories that were excepted from P.P. 10014.  Diversity visa selectees experienced a decrease in visa issuance that was **22%** greater.

In sum, while the pandemic had a significant impact on visa issuance in all immigrant visa categories, those subject to P.P. 10014 and the No-Visa Policy were more adversely impacted.  As a result, the backlog and delay for those visa applicants subjected to P.P. 10014 is greater than it would have been absent that Proclamation.  The Court assumes, for purposes of the analysis herein, that this residual harm constitutes cognizable injury.

B.    Causation

The annual DOS data on visa issuance above shows that there is some harm which is attributable to P.P. 10014 and the No-Visa policy, rather than the processing delays caused by the

---

[2] Available at https://travel.state.gov/content/travel/en/legal/visa-law0/visa-statistics/annual-reports/report-of-the-visa-office-2020.html.

[3] Also available at https://travel.state.gov/content/travel/en/legal/visa-law0/visa-statistics/annual-reports/report-of-the-visa-office-2020.html.

pandemic. *Lujan*, 504 U.S. at 560-61. This injury is fairly traceable to the Defendants: the President, the Acting Secretary of Homeland Security, and the Secretary of State.[4] Docket No. 14. President Trump enacted P.P. 10014 and its extensions pursuant to his authority under § 1182(f) of the INA, and the Secretaries of Homeland Security and State were tasked with implementing its provisions through departmental policies and regulations. *See* Proc. 10014 § 3 ("[t]he Secretary of Homeland Security shall implement this proclamation as it applies to the entry of aliens pursuant to such procedures as the Secretary of Homeland Security, in consultation with the Secretary of State, may establish in the Secretary of Homeland Security's discretion"). *Cf. Young*, 2020 U.S. Dist. LEXIS 233614 at *27-28 (holding that the Plaintiffs' injury "is fairly traceable to the named Defendants: the President enacted the Proclamations, the Secretary of State directs the federal agency (DOS) which adjudicates immigrant visa applications at consulates worldwide, and the Secretary of Homeland Security is tasked with implementing the Proclamations in tandem with the Secretary of State"). Thus, Plaintiffs have satisfied the causation element of standing.

C.    Redressability

The problem for Plaintiffs lies in the third element of standing – redressability. Despite the backlog and delays caused by P.P. 10014, there is no effective relief which the Court may provide that is tailored to the legal harm (*i.e.*, delays suffered by family-based visa applicants). As of March 11, 2021, there were 502,950 immigrant visa applications pending in the National Visa Center ("NVC") backlog for the immediate relative visa categories which were excepted from P.P. 10014. *See* Second Austin Decl. at 3-4 (Docket No. 59). As of that same date, there were 1,922,073 immigrant visa applications pending in the NVC backlog for the IR-5 and family-preference visa categories, which were subject to P.P. 10014.[5] *See id.* As of April 30, 2021, there were 481,965 prospective immigrant visa applicants at the NVC who were eligible to be scheduled for an immigrant visa interview. Defendants' Supplemental Briefing in Support of their Motion to

---

[4] When a public officer sued in an official capacity ceases to hold office while the action is pending, their successor is automatically substituted as a party. *See* Fed. R. Civ. P. 25(d).

[5] These figures do not include employment-based immigrant visa applications, which are not at issue in the instant case.

Dismiss at 7 (Docket No. 88). Globally, U.S. consulates are still limited under acute pandemic circumstances, affecting their ability to process visas.

In the instant case, Plaintiffs ask for a reordering of the immigrant visa queue to move those affected by P.P. 10014 to the front of line, in order to eliminate the delay. They suggest appointing a Special Master to ensure that Court-ordered relief is implemented in an equitable manner. Opp. to MTD at 12. But in shaping relief, it will be extremely difficult for the Court to distinguish between those immigrant visa applicants who were prejudiced by P.P. 10014 from those who were not so prejudiced. To simply move all visa applications which were subject to P.P. 10014 ahead of, *e.g.*, immediate relative visa applications would be unfair to the latter. This "jumping of the line" would displace other applicants who are documentarily qualified and waiting for interviews. And ordering the immediate processing of 1,922,073 visa applications would require a massive shift in DOS and consulate resources. The classwide relief Plaintiffs now demand is impracticable and raises grave equitable concerns.

Nor can this Court simply order DOS to speed up processing on an aggregate basis. There are training requirements for consular officials which would take months, or longer, for DOS to implement. Moreover, the speed by which consular offices can be reopened and expanded depends on local health and safety conditions, which are highly variable and subject to the unforeseeable shifts in pandemic conditions on a country-by-country basis. To afford the relief Plaintiffs seek would require the Court to oversee broad and complicated human resource and public health choices made by DOS employees, a task which goes well beyond remedying the specific harms caused by P.P. 10014. *Cf. E. Bay Sanctuary Covenant v. Barr,* 934 F.3d 1026, 1029 (9th Cir. 2019) ("all injunctions—even ones involving national policies—must be 'narrowly tailored to remedy the specific harm shown'") (quoting *City & Cty. of S.F. v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018)).

In arguing that the Court has broad powers to shape relief, Plaintiffs cite *Hutto v. Finney*, 437 U.S. 678, 98 S. Ct. 2565 (1978), which held that the district court was entitled to shape remedial orders after it had found, on several occasions, that conditions in the Arkansas penal system constituted cruel and unusual punishment under the Eighth Amendment. *Id.* at 687. The

13

district court "had ample authority to go beyond earlier orders and to address each element contributing to the violation," and it could properly impose a maximum limit of 30 days on confinement in punitive isolation. *Id.* But the equitable relief in *Hutto* was closely linked to the unlawful conditions in the state's penal system. The classwide relief Plaintiffs seek here is not tailored to the injury caused by P.P. 10014 and DOS's implementation. *Cf. Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,* 886 F.3d 803, 819 (9th Cir. 2018) ("[t]here must be a 'sufficient causal connection' between the alleged irreparable harm and the activity to be enjoined") (citing *Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 981-82 (9th Cir. 2011)).

The Court finds, for standing purposes, that Plaintiffs' harms are not redressable on a classwide basis and that Plaintiffs lack standing for the prospective relief they seek on behalf of family-based visa applicants. In effect, the claim for broad classwide redress has effectively been mooted by the rescission of P.P. 10014. *Cf. Kavoosian v. Blinken*, No. 20-55325, 2021 U.S. App. LEXIS 3808, at *3 (9th Cir. Feb. 9, 2021) (finding that an APA challenge for an unreasonable delay in waiver adjudication under P.P. 9645 was moot because "the Proclamation which rescinded PP 9645 now directs visa processing to resume in a manner similar to that which Plaintiffs-Appellants seek in their operative complaint"). As noted below, however, applicants for a diversity visa for 2021 (DV-2021 Plaintiffs) stand on different grounds for standing purposes.

D.    Mootness Exceptions

The parties dispute the applicability of two exceptions to the mootness doctrine: voluntary cessation and injuries which are capable of repetition yet evading review ("CRYER").

1.    Voluntary Cessation

When a defendant voluntarily ceases the allegedly unlawful conduct, it does not necessarily moot the case, for a defendant's "voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189, 120 S. Ct. 693, 708 (2000). *See also Knox v. SEIU, Local 1000*, 567 U.S. 298, 307, 132 S. Ct. 2277, 2287 (2012) ("[t]he voluntary cessation of challenged conduct does not ordinarily render a case moot because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed").

14

However, when the Government changes its policy, there is a presumption that it acts in good faith under the voluntary cessation exception. *See Rosebrock*, 745 F.3d at 971 ("[w]e presume that a government entity is acting in good faith when it changes its policy"); *Am. Cargo Transp., Inc.*, 625 F.3d at 1180 ("unlike in the case of a private party, we presume the government is acting in good faith"). "[A] voluntary change in official stance or behavior moots an action only when it is absolutely clear to the court, considering the procedural safeguards insulating the new state of affairs from arbitrary reversal and the government's rationale for its changed practice(s), that the activity complained of will not reoccur." *Fikre v. FBI*, 904 F.3d 1033, 1039 (9th Cir. 2018).

The current Administration has unequivocally changed the challenged immigration policy by repealing the Proclamation at issue. P.P. 10149, the rescinding Proclamation, states that P.P. 10014 "harms the United States, including by preventing certain family members of United States citizens and lawful permanent residents from joining their families here." 86 Fed. Reg. 11847 (Feb. 24, 2021). It also harms "individuals who were selected to receive the opportunity to apply for, and those who have likewise received, immigrant visas through the Fiscal Year 2020 Diversity Visa Lottery." *Id.* President Biden determined, pursuant to his authority under § 1182(f) of the INA, that the "unrestricted entry into the United States of persons described in section 1 of Proclamation 10014 is not detrimental to the interests of the United States." *Id.* The rescinding Proclamation is therefore "broad in scope and unequivocal in tone" and represents a permanent policy shift by a new Presidential Administration, not a temporary change that the Administration will refute once this litigation has concluded. *Cf. White v. Lee*, 227 F.3d 1214, 1243 (9th Cir. 2000) (holding that "the Achtenberg memorandum [issued by HUD] represent[ed] a permanent change in the way HUD conducts FHA investigations, not a temporary policy that the agency w[ould] refute once th[e] litigation ha[d] concluded … [and] [t]he memorandum [was] broad in scope and unequivocal in tone").

Furthermore, DOS has issued guidance directing consular officials to process immigrant visa applications without regard for P.P. 10014. Docket No. 59-5. In implementing the rescission of P.P. 10014, DOS officials have ceased the No-Visa Policy which the Plaintiffs challenge as

unlawful.  *Cf. Rosebrock*, 745 F.3d at 972 ("we have indicated that mootness is more likely if …

'since [the new policy's] implementation the agency's officials have not engaged in conduct

similar to that challenged by the plaintiff[]'") (quoting *White*, 227 F.3d at 1243).

    The data reports which the Government has submitted demonstrate that DOS has

implemented the rescission of the challenged policies.  For instance, after the rescission of P.P.

10014, several consular posts notified the National Visa Center of their capacity to interview

applicants in the IR-5 category (parents of a U.S. citizen), who were previously subject to P.P.

10014, and NVC scheduled 294 IR-5 cases for an interview.  Second Austin Decl. ¶ 7 (Docket No.

59-2).  In a data report submitted April 8, 2021, the Government reported additional progress on

visa processing.  DOS scheduled 7,850 IR-5 visa applicants and 3,821 family preference

applicants for interviews in the month of April.  Joint Status Report at 8 (Docket No. 67).

Consular posts processed 31,595 immigrant visa cases in March (for an average of about 7,899

cases per week).  *Id.*

    More progress was reported in the April 29, 2021 status report.  During a two-week period

from April 9 to April 22, DOS issued visas to 2,699 IR-5 applicants and 3,289 family preference

applicants.  Defendants' First Biweekly Status Update at 2 (Docket No. 73).  For reference, during

that same time, DOS issued 4,216 visas to applicants in the IR-1 and IR-2 categories.  *Id.*

    In an amended biweekly status update on April 30, 2021, the Government issued **12,474**

visas to applicants in the family-preference and IR-5 categories.  Defendants' Amended First

Biweekly Status Update at 2 (Docket No. 74).  From April 23 to May 6, DOS issued 6,500 visas to

applicants in the family-preference and IR-5 categories.  Defendants' Second Biweekly Status

Update at 2 (Docket No. 77).

    In sum, the data on visa issuance since the rescission of P.P. 10014 shows that P.P. 10149,

the rescinding Proclamation, is a broad and unequivocal change in immigration policy by the

current Administration, not merely a temporary policy change that the Government will refute

once this litigation has concluded.  The Court therefore finds that the voluntary cessation

exception to the mootness doctrine does not apply to the instant case.

2.    Capable of Repetition Yet Evading Review ("CRYER")

Plaintiffs argue that this case is not moot for a second reason: the issues presented herein are capable of repetition yet evading review.  Issues which are "capable of repetition, yet evading review" present an exception to the mootness doctrine.  *Am. Rivers v. Nat'l Marine Fisheries Serv.*, 126 F.3d 1118, 1123 (9th Cir. 1997).  However, this exception is limited to extraordinary cases where "(1) the duration of the challenged action is too short to be fully litigated before it ceases, and (2) there is a reasonable expectation that the plaintiffs will be subjected to the same action again."  *Doe v. Madison Sch. Dist. No. 321*, 177 F.3d 789, 798 (9th Cir. 1999) (internal quotation omitted).  For a controversy to be "too short to be fully litigated before it ceases," "it must be of *inherently* limited duration."  *ProtectMarriage.com - Yes on 8 v. Bowen*, 752 F.3d 827, 836 (9th Cir. 2014) (emphasis in original; internal quotation omitted).  This is so because the exception is concerned with the class of cases that, "absent an exception, would *always* evade judicial review."  *Id.* (emphasis in original).

Plaintiffs have not shown that a suit challenging a Presidential Proclamation falls within a class of cases that *inherently* evade judicial review.  Plaintiffs argue that P.P. 10014 and its extensions were of inherently limited duration because they each contained a fixed expiration date.  Opp. to MTD at 19.  However, each of these Proclamations had a provision allowing the entry ban to be continued by the President "as necessary."  For instance, P.P. 10131 provided the President with the authority to extend the Proclamation's entry ban past March 31, 2021, "as necessary."  Proc. 10131 § 1, 86 Fed. Reg. 417 (Dec. 31, 2020).  Thus, the duration of P.P. 10014 and its extensions was uncertain, and the Proclamation could have remained in effect throughout the pendency of this suit had the President exercised his authority to continue it as necessary.

In contrast, the doctrine applies to actions which are temporary *by their very nature*.  *See, e.g.*, *Porter v. Jones*, 319 F.3d 483, 490 (9th Cir. 2003) (noting that election cases often fall within the CRYER exception because "the inherently brief duration of an election is almost invariably too short to enable full litigation on the merits").  For instance, in *Sosna v. Iowa*, 419 U.S. 393, 95 S. Ct. 553 (1975), Iowa imposed a one-year durational residency requirement for its citizens to invoke its divorce jurisdiction, and the Court found that this law presented an issue capable of

*Id.* at 402.  By the time the case reached the Supreme Court, named Plaintiff-appellant had satisfied the one-year residency requirement, but because the case was brought as a putative class action, the Court held that "the class of unnamed persons described in the certification acquired a legal status separate from the interest asserted by appellant."  *Id.* at 399.  The Court noted that in *Dunn v. Blumstein*, 405 U.S. 330, 92 S. Ct. 995 (1972), Tennessee's durational residency requirement for voting in its elections was found to present an issue capable of repetition yet evading review for *new* residents moving to the state, even though the challenger had met the requirement and was eligible to vote by the time the case reached the Court.  *See id.* at 333 n.2.  The Court in *Sosna* held that "[t]he rationale of *Dunn* control[led]" and that "*new* residents of Iowa [were] aggrieved by an allegedly unconstitutional statute enforced by state officials."  *Id.* at 401 (emphasis added).  Unlike durational residency requirements, which can inflict harms that *inherently* evade judicial review, the instant case challenges a government policy that has been rescinded in uniform fashion, and is not one which inherently evades judicial review.

Further, Plaintiffs have not shown, beyond mere speculation, that there is a reasonable expectation of being subjected to the same legal action once more (*i.e.*, of being subjected to another Proclamation which imposes an entry ban, and to an agency policy which suspends the processing of their visa applications).  *Cf. W. Coast Seafood Processors Ass'n v. NRDC*, 643 F.3d 701, 704-05 (9th Cir. 2011) ("the 'capable of repetition' prong of the [mootness] exception requires a reasonable expectation that the same party will confront the same controversy again … [and] a speculative possibility does not constitute a reasonable expectation") (internal quotation omitted); *Kavoosian*, 2021 U.S. App. LEXIS 3808 at *3 ("Plaintiffs-Appellants' argument that this case is capable of repetition yet evades review is conclusory, as they provide no evidence of a reasonable expectation that they will confront this controversy again") (internal quotation omitted).  The Court finds that the CRYER exception to the mootness doctrine does not apply to the instant case.

E.     DV-2021 Plaintiffs

    1.     Standing

In contrast to the hundreds of thousands of family-based visa applicants for which

Plaintiffs seek sweeping relief, DV-2021 Plaintiffs face the unique prospect of irreparable harm which can be redressed without the displacement of other visa applicants. DV-2021 applicants face the strict timelines which the INA sets for the adjudication of their approved visa applications. These applicants are at risk of permanently losing their opportunity to immigrate to the United States if their applications are not processed in time.

Congress has reserved 55,000 diversity visas each fiscal year for randomly selected applicants from countries with historically low levels of immigration to the United States. 8 U.S.C. § 1151(e). They are selected on a random basis. Among the Plaintiffs in this case are selectees for diversity visas in 2021. DV-2021 selectees must receive a visa by the end of the fiscal year (September 30, 2021) or they *permanently* lose their opportunity to immigrate to the United States on those approved applications. 8 U.S.C. § 1154(a)(1)(I)(ii)(II) ("[a]liens who qualify, through random selection, for a [diversity] visa … shall remain eligible to receive such visa only through the end of the specific fiscal year for which they were selected"). As Judge Mehta noted in *Gomez v. Trump*, 485 F. Supp. 3d 145, 164 (D.D.C. 2020), only 12,000 DV-2020 visas had been issued on September 4, 2020, and because "the substantial majority of the remaining 43,000 diversity visas for th[at] fiscal year [were set to] go unissued … most of th[at] year's diversity visa selectees w[ould] permanently lose their opportunity to immigrate to the United States through the diversity visa program" if relief were not offered.

In the two-week period from April 9 to April 22, DOS issued 283 visas to DV-2021 selectees. Defendants' First Biweekly Status Report at 3 (Docket No. 73). DOS has cumulatively issued **1,483 visas to DV-2021 selectees** since the rescission of P.P. 10014. Defendants' Final Biweekly Status Report at 3-4 (Docket No. 87). It has scheduled **2,817 DV-2021 cases** for an interview since the rescission of P.P. 10014, and this number represents a total of **4,971 DV-2021 applicants**. *Id.*

For reference, the eighteen-year average for diversity visas issued between FY 1998 and 2016 was **47,404**, though the yearly allotment of visas has vacillated between 50,000 and 55,000. *Gomez v. Trump*, 490 F. Supp. 3d 276, 287 (D.D.C. 2020). There is a risk that DOS will not reach its average of 47,404 visas issued, much less issue the full number of 55,000 visas available to

19

United States District Court
Northern District of California

DV-2021 selectees.[6]  Plaintiff-selectees who do not have their applications adjudicated before the end of the fiscal year will suffer irreparable harm: they will permanently lose their ability to immigrate to the United States through the diversity visa lottery program.[7]  As noted *supra*, there was a 59% decrease in visa issuance for diversity visa selectees in FY 2020.  P.P. 10014 and the No-Visa policy were in effect for almost five months in FY 2021 (from the beginning of the fiscal year on October 1, 2020, to February 24, 2021, the date of the Proclamation's rescission).  DOS did not issue *any* diversity visas in FY 2021 until the week of March 12, 2021.  *See* Defendants' Second Biweekly Status Update at 3.  P.P. 10014 and the No-Visa Policy imposed a complete freeze on visa issuance in the diversity visa category for a significant portion of FY 2021.  DV-2021 Plaintiff-selectees may be irreparably harmed as a result of this freeze in visa issuance if their applications are not processed before the end of the fiscal year.  The delay occasioned by P.P. 10014 and the No-Visa Policy threatens truly irreparable injury.

Unlike the hundreds of thousands of family-based visa applants for which Plaintiffs seek sweeping and potentially inequitable relief, the harm to the DV-2021 Plaintiffs is redressable in a way that is practicable without displacing others.  Judge Mehta has addressed this very problem in *Gomez* and has issued several orders designed to tailor a practicable remedy to the harm caused by P.P. 10014 to diversity visa selectees.  On September 4, 2020, Judge Mehta preliminarily stayed the No-Visa Policy as applied to DV-2020 selectees and ordered DOS to undertake "good-faith efforts" to expeditiously adjudicate as many DV-2020 applications as possible before the end of

---

[6] The Government states that, of the 71,817 DV-2021 selectees, 54,012 are assigned to the 30 highest-volume DV processing posts, representing approximately 75% of the total worldwide volume of DV cases.  Defendants' Supplemental Briefing in Support of their Motion to Dismiss at 8 (Docket No. 88).  Of these 30 highest DV processing posts, the CDC has issued a Level 4 Travel Health Notice, which is the highest level of risk assessment, indicating a "very high level of COVID-19 in the country," for 18 countries, and a Level 3 Travel Health Notice, indicating a "high level of COVID-19" for seven more countries, leaving only three countries in the top 30 with low levels of COVID-19.  *Id.*  The harm which DV-2021 selectees face (the expiration of their visas before the end of the fiscal year) is imminent and not hypothetical.  *Cf. Wilderness Soc'y, Inc. v. Rey*, 622 F.3d 1251, 1256 (9th Cir. 2010) ("[p]ast injury is not sufficient to confer standing," for "[t]here must be an imminent future injury that is sought to be enjoined") (internal quotation omitted).

[7] Of course, selectees can always enter the diversity lottery again in future years, but as the district court noted in *Gomez*, the odds of winning the diversity lottery twice are "vanishingly slim." *Gomez*, 485 F. Supp. 3d at 164 n.3.

the fiscal year on September 30, 2020. *Gomez*, 485 F. Supp. at 205. When it became apparent that time was running out before the end of the fiscal year, Plaintiffs subsequently asked the Court to order DOS to reserve approximately 30,000 FY 2020 diversity visa numbers for adjudication after September 30 pending a final decision on the merits. *Gomez*, 490 F. Supp. at 282-83. Because the fiscal year had not passed, Judge Mehta found that the Court had equitable authority and discretion to order DOS to reserve visas for future processing pending final resolution on the merits. *Id.* at 286. Judge Mehta sought to put DV-2020 selectees in the position they would have been in had P.P. 10014 never been enacted. Factoring in the reduction in visa issuance which would have resulted from the pandemic even if P.P. 10014 had never been enacted, Judge Mehta ordered DOS to reserve 9,095 diversity visa numbers after September 30, 2020, for the future processing of named Plaintiffs' and class members' diversity visa applications, pending final adjudication of the matter. *Id.* at 290.

These remedies provide a template for the Court in the instant case. Importantly, the remedies offered in *Gomez* did not lead to the direct displacement of other documentarily qualified immigrant visa applicants. So, too, here. This Court may fashion relief for DV-2021 selectees in a manner that is practicable and does not raise the intractable equitable problems discussed above with respect to the hundreds of thousands of family-based visa applications.

Further, the remedy provided by this Court would be closely tailored to the harm which is alleged in the complaint (the irreparable harm which results from the failure to issue a diversity visa to a qualified applicant before the end of the fiscal year). Unlike the family-preference and IR-5 categories, the Court can tailor its injunctive relief to remedy the specific harm alleged. *Cf. Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991) ("[i]njunctive relief … must be tailored to remedy the specific harm alleged"). There are 71,817 DV-2021 selectees who are eligible to receive one of the 55,000 DV-2021 visas allotted by statute. Miles Decl. ¶ 4 (Docket No. 88-2). The Court's relief will be tethered to the numerical limit of 55,000 DV-2021 visas, factoring in the general pandemic-related delays which are unconnected to P.P. 10014 and would have resulted even without the Proclamation. Instead of overseeing broad and complicated human resource decisions, the Court will oversee specific, concrete relief which is tethered to a

finite number of DV-2021 applicants.

Since DV-2021 selectees may suffer concrete irreparable injury caused by P.P. 10014 and DOS's implementation thereof, and since that injury is redressable as a practical matter, the third element is met and thus these Plaintiffs, and the putative class they represent, have standing. Their case is not moot.[8]

### 2. Preliminary Injunctive Relief and Class Certification

DV-2021 Plaintiffs have filed a Renewed Motion for Class Certification (Docket No. 16) and a Motion for Preliminary Injunctive Relief (Docket No. 31). However, the operative First Amended Complaint (Docket No. 14) is not brought as a putative class action. The FAC does not define the class or explain why the prerequisites for class certification under Federal Rule of Civil Procedure 23 are met, and there is no express prayer for relief which includes class certification. *See* FAC § 7.

Federal Rule of Civil Procedure 8 requires the complaint to contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This statement includes "a demand for the relief sought, which may include relief in the alternative or different types of relief." Fed. R. Civ. P. 8(a)(3). Such a statement must "give the defendant fair notice of the basis for the plaintiff's claims." *Kwai Fun Wong v. United States INS*, 373 F.3d 952, 969 (9th Cir. 2004).

The FAC fails to provide the Government with any notice that Plaintiffs intend to bring a class action on behalf of similarly situated persons, nor does it define the class Plaintiffs seek to certify. Accordingly, the Court **DENIES** the Motion for Class Certification as to DV-2021 Plaintiffs **without prejudice**. Because the Court will not grant classwide interim relief absent class certification, the Court **DENIES** DV-2021 Plaintiffs' Motion for Preliminary Injunctive relief **without prejudice**. The Court grants DV-2021 Plaintiffs leave to amend to file a Second

---

[8] The Court notes that the diversity visa Plaintiffs in the putative class in *Anunciato et al. v. Biden et al.*, Case No. 3:20-cv-07869-RS, which is before Judge Seeborg, have voluntarily dismissed their claims. Additionally, *Goh et al. v. Department of State et al.*, Case No. 1:21-cv-00999, a case brought by DV-2021 selectees which is currently before Judge Mehta, is not a class action. Accordingly, the Court has jurisdiction to adjudicate the Motion for Class Certification for DV-2021 selectees in the instant case.

Amended Complaint properly alleging a class action. DV-2021 Plaintiffs shall also file a renewed Motion for Class Certification and a renewed Motion for Preliminary Injunctive Relief.

### III. <u>CONCLUSION</u>

Because the family preference and IR-5 Plaintiffs lack standing following the rescission of P.P. 10014, the Court **GRANTS** the Government's Motion to Dismiss this case as moot as it pertains to the family preference and IR-5 Plaintiffs. The Motion for Class Certification (Docket No. 16), Motion for Preliminary Injunctive Relief (Docket No. 31), and Motion for Expedited Discovery (Docket No. 37) are all **DENIED** as moot and for lack of standing for Plaintiffs in the family preference immigrant visa category and those in the IR-5 immigrant visa category.

However, the Court **DENIES** the Government's Motion to Dismiss as it pertains to DV-2021 Plaintiffs, because these Plaintiffs continue to possess standing. Because DV-2021 Plaintiffs have not alleged a class action in the operative complaint, the Court **DENIES** the Motion for Class Certification (Docket No. 16) and Motion for Preliminary Injunctive Relief (Docket No. 31) as it pertains to DV-2021 Plaintiffs **without prejudice**. The Court **directs** DV-2021 Plaintiffs to file a Second Amended Complaint which properly alleges a class action and **directs** DV-2021 Plaintiffs to file renewed Motions for Class Certification and Preliminary Injunctive Relief. DV-2021 Plaintiffs shall file the SAC and these motions by **June 22, 2021**. The Government shall file its response to the SAC and its opposition to these motions by **July 2, 2021**. The Court will hear argument on the Second Amended Complaint and the renewed Motions for Class Certification and Preliminary Injunctive Relief on **July 15, 2021**. The Court also directs the parties to meet and confer to see if they can stipulate to relief.

///
///
///
///
///
///
///

The Court **DENIES** the Motion for Expedited Discovery (Docket No. 37) as it relates to DV-2021 Plaintiffs because the information sought has already been provided by the Government in its biweekly status reports.

This order disposes of Docket Nos. 16, 17, 31, 37, and 60.

**IT IS SO ORDERED**.

Dated: June 8, 2021

_____
EDWARD M. CHEN
United States District Judge